James A. Hunter (JH-1910)
HUNTER & KMIEC
255 West 94th Street, No. 10M
New York, New York  10025
Tel:     (646) 666-0122
Fax:     (646) 462-3356
E-Mail: hunter@hunterkmiec.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CODY CHRISTOPHERSON,<br><br>Plaintiff,<br><br>– v. –<br><br>PLATINUM PARTNERS VALUE ARBITRAGE FUND L.P. and PLATINUM-MONTAUR LIFE SCIENCES, LLC,<br><br>Defendants,<br><br>– and –<br><br>NAVIDEA BIOPHARMACEUTICALS, INC. (f/k/a Neoprobe Corporation),<br><br>Nominal Defendant. | ECF CASE<br><br>No. _____<br><br>COMPLAINT FOR RECOVERY OF SHORT-SWING PROFIT UNDER 15 U.S.C. § 78p(b)<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Cody Christopherson ("Plaintiff"), by his undersigned attorneys,

hereby complains of Defendants, averring as follows:


**INTRODUCTION**

1.      This action arises under Section 16(b) of the Securities Exchange

Act of 1934, as amended (the "Act"), 15 U.S.C. § 78p(b).

2.      Section 16 is the "original and only express 'insider' trading provision[]" of the Act.  Richard W. Jennings et al., Securities Regulation: Cases and Materials 1202 (8th ed. 1998).  Its purpose is to "prevent[] the unfair use of information" that an insider may have "by reason of his relationship to the issuer."  15 U.S.C. § 78p(a).

3.      Section 16 applies to the directors and officers of every issuer with a class of publicly traded equity securities.  *Id.* § 78p(a), (b).  It also applies to each beneficial owner of more than 10% of the outstanding shares of any such class.  *Id.*  If any such officer, director, or beneficial owner profits from the purchase and sale, or sale and purchase, of the issuer's equity securities within less than six months, Section 16(b) requires him to disgorge that profit to the issuer.  *Id.* § 78p(b).  If he does not disgorge it, Section 16(b) empowers the issuer, or "the owner of any security of the issuer," to bring suit to recover it.  *Id.*

4.      Section 16(b) liability is strict.  Once an insider is shown to have profited from a "short-swing" transaction in the issuer's equity securities, he must disgorge that profit "irrespective of [his] intention . . . in entering into such transaction." *Id.*  The plaintiff is never required to prove scienter or the actual misuse of inside information to recover.  *See Reliance Elec. Co. v. Emerson Elec. Co.*, 404 U.S. 418, 422 (1972).

5.      The plaintiff in this case, a stockholder of Nominal Defendant Navidea Biopharmaceuticals, Inc. ("Navidea"), brings suit against two other Navidea stockholders: Platinum Partners Value Arbitrage Fund L.P. (the "Platinum Fund") and Platinum-Montaur Life Sciences, LLC ("Platinum-Montaur" and, collectively with the

Platinum Fund, the "Platinum Defendants").  For years, the Platinum Defendants contrived to evade the disclosure and liability provisions of Section 16 of the Act.  They did so through contractual devices designed to artificially maintain their beneficial ownership of Navidea's common stock below the statute's 10% threshold.

6.     These devices observed neither the letter nor the spirit of the law. As alleged in more detail below, the Platinum Defendants remained subject to Section 16 of the Act at all relevant times.  They were subject to Section 16 at all relevant times as the beneficial owners of more than 10% of the outstanding shares of Navidea's common stock.  And at all times since November 13, 2013, they were also subject to Section 16 as statutory directors while their deputy sat on Navidea's board.

7.     While subject to Section 16 of the Act, the Platinum Defendants realized hundreds of thousands of dollars in "short-swing" profit from their disclosed transactions in Navidea's common stock.  Their filings with the U.S. Securities and Exchange Commission ("SEC") suggest that many additional transactions remain to be disclosed.  The true extent of their profit cannot be known until a full accounting of these transactions is made, but it likely extends into the millions of dollars.

8.     Under Section 16(b) of the Act, this profit is Navidea's lawful property, which the Platinum Defendants are strictly liable to account for and repay.

## JURISDICTION AND VENUE

9.     Jurisdiction is conferred on this Court by Section 27 of the Act, 15 U.S.C. § 78aa.

10.     Venue lies in this District under Section 27 of the Act because (a) each Platinum Defendant maintains its principal office in this District and transacts business therein; and (b) certain of the purchases and sales of securities described herein were executed in ordinary brokerage transactions through the facilities of the NYSE MKT LLC (f/k/a the American Stock Exchange LLC), a national securities exchange registered under Section 6 of the Act, 15 U.S.C. § 78f, and located in this District.

## PARTIES

### The Parties to This Action

11.     Plaintiff Cody Christopherson is a resident of the State of California and a stockholder of Navidea.

12.     Defendant Platinum Partners Value Arbitrage Fund L.P. is an exempted limited partnership formed under the law of the Cayman Islands with a principal place of business in the State of New York, County of New York.

13.     Defendant Platinum-Montaur Life Sciences, LLC is a limited liability company formed under the law of the State of Delaware with a principal place of business in the State of New York, County of New York.  Platinum-Montaur is a subsidiary of the Platinum Fund, which serves as Platinum-Montaur's managing member.

14.     Nominal Defendant Navidea Biopharmaceuticals, Inc. (f/k/a Neoprobe Corporation) is a corporation formed under the law of the State of Delaware with a principal place of business in the State of Ohio.

**Other Relevant Parties**

15.    Michael M. Goldberg, M.D. ("Goldberg") is a natural person and a resident of the State of New York, County of New York.  He has been a director of Navidea since November 2013 and served as its Chief Executive Officer from about May 15, 2014 to about October 13, 2014.  He was the portfolio manager of Platinum-Montaur until at least November 2013.

16.    Montaur Capital Partners, LLC ("Montaur Capital") is a limited liability company formed under the law of the State of Delaware with a principal place of business in the State of New York, County of New York.  Montaur Capital is and has been at all relevant times an affiliate of the Platinum Defendants.  Goldberg founded Montaur Capital and has been its managing member and managing partner at all relevant times.

17.    Macrophage Therapeutics, Inc. ("Macrophage") is a corporation formed under the law of the State of Delaware with a principal place of business in the State of Ohio.  Macrophage is a wholly owned subsidiary of Navidea.  Goldberg has served as its Chief Executive Officer at all times since its formation in December 2014.

**FACTUAL ALLEGATIONS**

**Background on the Platinum Defendants'
Investment in Navidea**

18.    The Platinum Defendants have been investors in Navidea since at least 2007.  Since that time, they have come to dominate its management and affairs.

19.     In November 2010, the Platinum Defendants persuaded Navidea to replace David Bupp, Navidea's longtime Chief Executive Officer, with their preferred leader, Mark Pykett.  Dr. Pykett also joined Navidea's Board of Directors a few months later.

20.     In April 2011, the Platinum Defendants succeeded in seating two of their nominees, Peter Drake and Jess Jones, on Navidea's Board of Directors. Although Dr. Jones resigned in 2013, Dr. Drake remained on the board until July 2015.

21.     In November 2013, the Platinum Defendants succeeded in seating yet another director on Navidea's board: Goldberg.

22.     Unlike Drs. Pykett, Jones, and Drake, Goldberg was more than just the Platinum Defendants' preferred candidate.  He was also one of their principals, the portfolio manager of the Platinum Fund, and the managing member of Montaur Capital. To this day, he shares offices with the Platinum Defendants, collaborates with them on investments (including investments in Navidea), and runs Montaur Capital.

23.     On May 15, 2014, Navidea replaced Dr. Pykett as Chief Executive Officer.  According to a media report, he was replaced at the Platinum Defendants' behest, just as he was hired at their behest four years earlier.

24.     Dr. Pykett's replacement was none other than Goldberg.  Navidea named him interim Chief Executive Officer while it searched for a permanent replacement.  He remained in that role until the current Chief Executive Officer took over in October 2014, and he remains a member of Navidea's Board of Directors to this day.

25.     The Platinum Defendants came about their influence over Navidea through a series of financing transactions.  These transactions gave the Platinum Defendants several series of warrants and preferred stock exercisable for or convertible into substantial blocks of Navidea common stock.  The Platinum Defendants also extended Navidea a credit facility allowing it to borrow up to $50 million.

26.     By the end of 2012, the Platinum Defendants beneficially owned 10,728,324 shares of Navidea's common stock, or 9.98999987% of the shares then outstanding.  Their derivative securities gave them the right to acquire another 33,420,593 shares.  These various securities gave them a commanding position in Navidea's equity.

### The Platinum Defendants' Contrivances
### To Evade Section 16 of the Act

27.     Despite their substantial investment in and influence over Navidea, the Platinum Defendants have disclosed only a fraction of their transactions in Navidea's securities.

28.     They contrived to avoid the reporting and liability provisions of Section 16 of the Act with a hodgepodge of exchange agreements, waivers, "blockers," notional derivatives, and similar contractual devices.

29.     These devices all had the same purpose: to keep the Platinum Defendants below Section 16's 10% ownership threshold by limiting, at least ostensibly, their right to acquire Navidea's common stock.

30.     This scheme of evasion gathered steam in 2012 after a series of missteps left the Platinum Defendants liable to disgorge approximately $45,000 in short-swing profit to Navidea.

31.     These missteps began in July 2012.  That month the Platinum Defendants converted 3,063 shares of Navidea's Series B Convertible Preferred Stock (the "Series B Preferred Stock") into 10,016,010 shares of Navidea's common stock.  The Platinum Defendants thereby became the beneficial owners of more than 10% of the outstanding shares of Navidea's common stock.

32.     The Platinum Defendants did not publicly disclose their 10% ownership status — possibly because they were unaware of it — until November 9, 2012.  That day they filed with the U.S. Securities and Exchange Commission (the "SEC") an Initial Statement of Beneficial Ownership on Form 3 (the "2012 Form 3").  In Item 4 of the 2012 Form 3, the Platinum Defendants described their relationship to Navidea as "10% Owner."

33.     A true and correct copy of the 2012 Form 3, in the form in which Plaintiff's counsel printed it from the SEC's Electronic Data Gathering, Analysis, and Retrieval ("EDGAR") system, is attached hereto as Exhibit A.

34.     The same day the 2012 Form 3 was filed, the Platinum Defendants also filed with the SEC a Statement of Changes in Beneficial Ownership on Form 4 (the "November 9, 2012 Form 4").  A true and correct copy of the November 9, 2012 Form 4, in the form in which Plaintiff's counsel printed it from the SEC's EDGAR system, is attached hereto as Exhibit B.

35.     The November 9, 2012 Form 4 disclosed that the Platinum Defendants had purchased and sold millions of dollars of Navidea's common stock in nine transactions in September and October of that year — after they had become 10% owners but evidently before they realized they were subject to the statute.

36.     The November 9, 2012 Form 4 also disclosed that, as a result of these purchases and sales, the Platinum Defendants had been forced to repay $45,472.84 in short-swing profit to Navidea under Section 16(b) of the Act.

37.     In the wake of this debacle, the Platinum Defendants took immediate action to limit their future Section 16 obligations.  They began negotiations with Navidea to unwind the conversion of Series B Preferred Stock they had completed just four months earlier.

38.     These negotiations culminated in a Securities Exchange Agreement dated as of November 27, 2012 between the Platinum Fund and Navidea (the "Exchange Agreement").  A true and correct copy of the Exchange Agreement, in the form in which Plaintiff's counsel printed it from the SEC's EDGAR system, is attached hereto as Exhibit C.

39.     The Exchange Agreement provided for the Platinum Fund to return to Navidea 3,001,860 shares of Navidea's common stock in exchange for 918 shares of Navidea's Series B Preferred Stock.

40.     This exchange reflected a rate of $3,001,860 \div 918 = 3,270$ shares of Navidea's common stock for every share of Series B Preferred Stock.

41.     This is the same rate at which the Platinum Defendants had converted the Series B Preferred Stock into Navidea's common stock just four months earlier.  In effect, the Exchange Agreement simply unwound a portion of the Platinum Defendants' conversion from July 2012.

42.     The Platinum Defendants disclosed the stock exchange in a Statement of Changes in Beneficial Ownership on Form 4 filed with the SEC on November 29, 2012 (the "November 29, 2012 Form 4").  A true and correct copy of the November 29, 2012 Form 4, in the form in which Plaintiff's counsel printed it from the SEC's EDGAR system, is attached hereto as Exhibit D.

43.     The November 29, 2012 Form 4 represented that the Platinum Defendants were "no longer subject to Section 16" because their "beneficial ownership of the Issuer's Common Stock [was] below ten percent."

44.     When the Platinum Defendants next disclosed their beneficial ownership of Navidea's common stock a few months later, they reported beneficially owning 10,728,324 shares, or 9.98999987% of the shares then outstanding.

**The "Blocker"**

45.     The Platinum Defendants thought the Exchange Agreement had brought them back under Section 16's 10% threshold.  Although their Series B Preferred Stock was convertible into as many as 22,687,260 shares of Navidea's common stock as of December 31, 2012, the Platinum Defendants viewed themselves as beneficially owning only a portion of these shares for purposes of Section 16.

46.     This view relied on certain terms in the Certificate of Designations, Voting Powers, Preferences, Limitations, Restrictions, and Relative Rights (the "Certificate of Designations") governing the Series B Preferred Stock.  Plaintiff refers to these terms collectively as the "Blocker".

47.     The Blocker purported to limit the Platinum Defendants' right to convert the Series B Preferred Stock to the extent conversion would make them the beneficial owners of more than 9.99% of Navidea's outstanding common stock.  It did not forbid such a transaction outright, but it required the Platinum Defendants to give Navidea 61 days' notice before the conversion could be completed.

48.     The 61-day notice requirement was significant because of how SEC rules define a "beneficial owner."  For purposes of determining 10% beneficial ownership under Section 16, the rules define a "beneficial owner" of stock as anyone with the "power to vote" or "power to dispose" of it.  Rule 13d-3(a), 17 C.F.R. § 240.13d-3(a), *applied in* Rule 16a-1(a)(1), 17 C.F.R. § 240.16a-1(a)(1) (defining a "beneficial owner" for purposes of Section 16's 10% owner calculation as "any person who is deemed a beneficial owner pursuant to section 13(d) of the Act and the rules thereunder").

49.     The SEC's rules also deem a person to have immediate beneficial ownership of stock if he has the right to acquire beneficial ownership (through, for example, the conversion of another security) "within sixty days."  Rule 13d-3(d)(1)(i), 17 C.F.R. § 240.13d-3(d)(1)(i), *applied in* Rule 16a-1(a)(1), 17 C.F.R. § 240.16a-1(a)(1).

50.     The Platinum Defendants entered into the Exchange Agreement, and caused Navidea to enter into the Exchange Agreement, because of the 61-day notice requirement of the Blocker.  In their view, this impediment to conversion put their acquisition rights outside the 60-day window within which they would be deemed to have beneficial ownership of the underlying shares.

51.     Because the Blocker applied to the extent of any underlying shares in excess of 9.99% of Navidea's common stock, the Platinum Defendants viewed it as capping their beneficial ownership below Section 16's 10% threshold.  With the Blocker in place, they figured they could continue to trade in and out of Navidea's common stock without Section 16 consequences and without giving up their dominant position in Navidea's equity.

52.     They were wrong.  Despite their artful contrivances, the Platinum Defendants remained subject to Section 16 of the Act at all relevant times.  They remained subject to Section 16 of the Act for two reasons.

53.     First, as alleged more fully in paragraphs 55-104 below, the terms of the Blocker were ineffective to divest the Platinum Defendants of beneficial ownership of the Navidea common stock underlying their Series B Preferred Stock.  Without an effective impediment to conversion, the Platinum Defendants remained the beneficial owners of more than 10% of the outstanding shares of Navidea's common stock at all relevant times.

54.     Second, as alleged more fully in paragraphs 105-128 below, the Platinum Defendants became statutory directors of Navidea when Goldberg, their

principal, joined Navidea's board.  Because he has served as their de facto deputy on the

board from November 2013 to the present, the Platinum Defendants have been subject to

Section 16 as directors of Navidea at all times since November 2013.

**The Platinum Defendants' Status as Beneficial Owners
of More than 10% of Navidea's Common Stock**

55.     "Blockers" and "conversion caps" are not uncommon features of

derivative securities and in many cases can achieve their intended purpose of divesting a

stockholder of beneficial ownership.

56.     But the particular terms of the Blocker, under the particular

circumstances of this case, were ineffective to divest the Platinum Defendants of

beneficial ownership of the shares underlying their Series B Preferred Stock.

57.     The terms of the Blocker are found in Section 7 of the Certificate

of Designations for the Series B Preferred Stock.  The Certificate of Designations was

amended and restated in 2013, but the terms of Section 7 were unaffected by the

amendment.  A true and correct copy of the amended and restated Certificate of

Designations, in the form in which Plaintiff's counsel printed it from the SEC's EDGAR

system, is attached hereto as Exhibit E.

58.     Section 7 of the Certificate of Designations for the Series B

Preferred Stock reads in its entirety as follows:

> 7.     Conversion Restriction.  Notwithstanding anything to the
> contrary set forth in Section 5 of this Certificate of Designation, at no time
> may a holder of shares of Series B Preferred Stock convert shares of the
> Series B Preferred Stock if the number of shares of Common Stock to be
> issued pursuant to such conversion would exceed, when aggregated with
> all other shares of Common Stock owned by such holder at such time, the
> number of shares of Common Stock which would result in such holder

owning (as determined in accordance with Section 13(d) of the Securities Exchange Act of 1934, as amended, and the rules thereunder) more than 9.99% of all of the Common Stock outstanding at such time; *provided*, *however*, that upon a holder of Series B Preferred Stock providing the Company with sixty-one (61) days notice (pursuant to Section 5(g) hereof) (the "Waiver Notice") that such holder would like to waive Section 7 of this Certificate of Designation with regard to any or all shares of Common Stock issuable upon conversion of Series B Preferred Stock, this Section 7 shall be of no force or effect with regard to those shares of Series B Preferred Stock referenced in the Waiver Notice.

59.     For four independent reasons, these terms were ineffective to relieve the Platinum Defendants of beneficial ownership of the shares of Navidea's common stock underlying their Series B Preferred Stock.

60.     *First*, the terms of the Blocker limit only the acquisition of the underlying shares upon conversion.  They do not limit other transactions in the underlying shares, such as forward or "short" sales, as the following example illustrates.

61.     Suppose the Platinum Defendants wanted to sell the underlying shares without waiting the 61 days required for conversion.  They could agree on Day 1 to sell the shares to a counterparty for delivery on Day 63.  They could then give Navidea the 61-day notice on Day 2 and instruct Navidea to deliver the underlying shares to the counterparty on Day 63.

62.     A transaction like this enables the immediate sale of the underlying stock, in any number of shares, while still deferring conversion by 61 days.  Because the transaction honors the 61-day notice requirement, the Blocker does not bar it.

63.     Far from forbidding transactions like this, the Certificate of Designations actually invites them.  The Form of Conversion Notice annexed to the

Certificate of Designations asks the Platinum Defendants whether "the Common Stock has been sold."  They may answer by checking "YES" or "NO".

64.     The Form of Conversion Notice also allows the Platinum Defendants to have the underlying shares issued to another person.  They may direct Navidea to "issue the Common Stock . . . in the following name and to the following address."  Blanks are provided for the counterparty's name and address.

65.     As these provisions show, the Blocker in no way limits, and in fact provides for, the immediate disposition of the common stock underlying the Platinum Defendants' Series B Preferred Stock.

66.     This is a significant lacuna because SEC rules do not assign "beneficial ownership" only to persons who have the right to acquire stock.  Under Rule 13d-3(a), a "beneficial owner" of stock includes any person who "has or shares . . . the power to dispose" of the stock.  17 C.F.R. § 240.13d-3(a)(2).

67.     Because the Certificate of Designations gave the Platinum Defendants the immediate and unfettered right to dispose of the underlying stock, it makes no difference whether the Blocker made them wait 61 days before acquiring it.  The "power to dispose" of the issuable shares gave them full and immediate beneficial ownership of all Navidea common stock underlying the Series B Preferred Stock.

68.     *Second*, the Platinum Defendants acquired the Series B Preferred Stock under circumstances disqualifying them from relying on the Blocker as an effective impediment to beneficial ownership of the underlying shares.

69.     SEC rules qualify the effectiveness of conversion blockers with the proviso that immediate beneficial ownership results if the convertible security was acquired with the purpose or effect of changing or influencing control of the issuer.  The proviso reads in pertinent part as follows:

> [A]ny person who acquires a [convertible] security . . . with the purpose or effect of changing or influencing the control of the issuer, or in connection with or as a participant in any transaction having such purpose or effect, immediately upon such acquisition shall be deemed to be the beneficial owner of the securities which may be acquired through the exercise or conversion of such security or power.

Rule 13d-3(d)(1)(i), 17 C.F.R. § 240.13d-3(d)(1)(i).

70.     The Platinum Defendants entered into the Exchange Agreement with the purpose of influencing control of Navidea, and their entry into the Exchange Agreement had precisely that effect.

71.     By the time of the Exchange Agreement, the Platinum Defendants had already placed three people on Navidea's Board of Directors.  They had agreed to vote for Navidea's additional nominees.  And within a year they would have a fourth person, Goldberg, on the board.

72.     The Platinum Defendants' influence over the control of Navidea resulted from their substantial investment in Navidea's voting securities, including the shares of Navidea's common stock underlying their Series B Preferred Stock.  The Blocker let them maintain this influence without subjecting them to Section 16 obligations.

73.     Had the Platinum Defendants held Navidea's common stock outright, the size of their position would have subjected them to the reporting and liability

provisions of Section 16.  Had they sold a significant portion of their common stock, or replaced it with debt or non-voting equity, they would have avoided Section 16 obligations but lost significant influence over Navidea.

74.     Their solution to this dilemma was to exchange their shares of Navidea common stock for shares of Series B Preferred Stock subject to the Blocker. They thought the Exchange Agreement would preserve their influence over Navidea's board while shielding them from Section 16 obligations.

75.     But precisely because the Exchange Agreement had the "purpose or effect" of preserving the Platinum Defendants' "influenc[e]" over the "control of the issuer," it could not divest them of beneficial ownership of the underlying common stock.

76.     Instead, the Platinum Defendants acquired immediate beneficial ownership of all shares of Navidea's common stock underlying the Series B Preferred Stock acquired in the Exchange Agreement.  *See* Rule 13d-3(d)(1)(i), 17 C.F.R. § 240.13d-3(d)(1)(i).

77.     The Platinum Defendants' influence over Navidea's board is evident in the Exchange Agreement itself.  Navidea received 3,270 shares of common stock for every share of Series B Preferred Stock issued under the Exchange Agreement, but it received no consideration for entering into the Exchange Agreement in the first place.

78.     While the Series B Preferred Stock is convertible into common stock, the opposite is not true.  A holder of Navidea's common stock has no right to

exchange it for shares of Navidea's Series B Preferred Stock.  The Exchange Agreement gave the Platinum Defendants that right for free.

79.     The Platinum Defendants could cause Navidea to enter into the Exchange Agreement only because they had tremendous influence over Navidea's Board of Directors.  That influence resulted from their large stake in Navidea's voting equity and the securities convertible into it.

80.     The execution of the Exchange Agreement was thus secured through the same influence it was designed to preserve.  By participating "in a[] transaction having such purpose or effect," the Platinum Defendants acquired immediate beneficial ownership of all Navidea common stock underlying the Series B Preferred Stock issued under the Exchange Agreement.  Rule 13d-3(d)(1)(i), 17 C.F.R. § 240.13d-3(d)(1)(i).

81.     *Third*, the Platinum Defendants could easily waive or amend the Blocker.

82.     The Blocker was not set forth in Navidea's certificate of incorporation or by-laws, and no action by Navidea's common stockholders was required before it was waived or amended.  The deletion of the Blocker from the Certificate of Designations required only a vote of the holders of the Series B Preferred and the filing of an amended certificate.

83.     These steps were easily accomplished.  The Platinum Defendants owned all of the outstanding shares of Series B Preferred, so a "vote" was just their diktat by another name.

84. Once the Platinum Defendants had voted to delete the Blocker, they could count on Navidea to file the amended certificate with the Delaware Secretary of State. They dominated Navidea's Board of Directors, having seated four of its members, including three of the seven who served from November 2013 to July 2014. Directors who displeased them, such as Mr. Bupp and Dr. Pykett, were terminated or demoted. The Platinum Defendants could reasonably expect accommodations from the rest.

85. The Blocker also served no corporate purpose for Navidea. Unlike more typical conversion caps, the Blocker was not drafted into the Certificate of Designations to limit an investor's influence or restrain a potential acquirer. Its sole purpose was to help the Platinum Defendants evade Section 16 without limiting their real influence over Navidea.

86. Viewed for what it was — as a device for skirting Section 16 — the Blocker was not a limitation of the Series B Preferred Stock so much as a perk. The Platinum Defendants had insisted on similar terms in other securities they owned. They selectively enforced or waived the terms of these securities to suit their interests in remaining over or under the 10% ownership threshold.

87. On two occasions, Navidea even allowed the Platinum Defendants to defer conversion to allow them to remain under the 10% threshold. The original Certificate of Designations governing the Series B Preferred Stock had mandated conversion by December 31, 2012. The Platinum Defendants and Navidea twice agreed to defer that deadline, first until June 2013 and then indefinitely.

88.     In each case, the Platinum Defendants wanted to defer conversion to avoid counting the underlying shares as "beneficially owned" under Section 16.  And in each case, Navidea obliged.  There is no reason to think it would object if the Platinum Defendants wished to "waive" or amend the Blocker as well.

89.     Because the Blocker could be waived or amended so easily, it made no difference that its terms purported to require 61 days' notice of conversion.  The Platinum Defendants could simply waive or amend those terms, and then convert without restriction.

90.     *Fourth*, the Blocker was a sham provision that did not actually limit conversion of the Series B Preferred Stock in practice.

91.     Enforcement of the 61-day notice requirement was entrusted entirely to Navidea and the Platinum Defendants, and Navidea had little incentive to police compliance.  As earlier alleged, the Blocker served no corporate purpose for Navidea, whose management was dominated in any event by the Platinum Defendants.

92.     The task of enforcing the Blocker thus fell to the Platinum Defendants.  They self-reported the beneficial ownership figures on which the operation of the Blocker depended.  Neither Navidea nor any other person had a right to challenge these calculations, and the Platinum Defendants inevitably took liberties with them.

93.     For example, the Platinum Defendants never included the holdings of other group members in calculating their beneficial ownership of Navidea's common stock.  Under SEC rules, coordinated decisionmaking between stockholders results in the formation of a stockholder "group" whose members must aggregate their individual

holdings for purposes of Section 13(d) and 16 of the Act.  *See* Rules 13d-5(b)(1), 16a-1(a)(1), 17 C.F.R. §§ 240.13d-5(b)(1), 240.16a-1(a)(1).  The Platinum Defendants routinely coordinated with Goldberg in deciding how to vote their Navidea common stock, yet they never included his shares in their beneficial ownership calculations.

94.     In at least one case, the Blocker was disregarded altogether.

95.     Recall that the Platinum Defendants had crossed the 10% threshold with their conversion of Series B Preferred Stock in July 2012.  Because that transaction made them the beneficial owners of more than 9.99% of Navidea's common stock, the Blocker entitled Navidea to 61 days' notice before it could be completed.

96.     Even if the conversion was completed as late as July 31, 2012, the Platinum Defendants would have been required to give notice no later than June 1 of that year.  And under the SEC's rules, they would have become the beneficial owners of the issuable common stock "within sixty days" of the conversion — i.e., by June 2 at the latest.  *See* Rule 13d-3(d)(1)(i), 17 C.F.R. § 240.13d-3(d)(1)(i), *applied in* Rule 16a-1(a)(1), 17 C.F.R. § 240.16a-1(a)(1).

97.     Yet the Platinum Defendants filed an amended statement of beneficial ownership on Schedule 13D with the SEC on June 4, 2012 (the "June 2012 Schedule 13D"), and that statement made no mention of the imminent conversion.  A true and correct copy of the June 2012 Schedule 13D, in the form in which Plaintiff's counsel printed it from the SEC's EDGAR system, is attached hereto as Exhibit F.

98.     The June 2012 Schedule 13D disclosed that the Platinum Defendants beneficially owned only 9,539,684 shares of Navidea's common stock, or

about 9.99% of the shares outstanding.  This figure included none of the shares to be issued to the Platinum Defendants the following month.  The statement also made no mention of any conversion notice.

99.     These omissions imply that the Platinum Defendants gave no timely conversion notice as required under the Blocker.  If any notice was given, it was given after the June 2012 Schedule 13D was filed, and therefore less than 61 days before conversion.

100.    More likely, the Platinum Defendants gave no notice at all.  They simply flouted the Blocker and demanded an immediate conversion of their Series B Preferred Stock.

101.    Either way, the affair shows that the Blocker was not consistently honored.  It gave the illusion of limiting the Platinum Defendants' conversion rights, even as they enjoyed an unlimited right to convert their Series B Preferred Stock immediately and in full.

102.    Because the Platinum Defendants had the de facto right to convert their Series B Preferred Stock on demand, they beneficially owned all underlying shares of Navidea's common stock at all relevant times.

103.    Beneficial ownership of the shares underlying the Series B Preferred Stock sufficed to make the Platinum Defendants the beneficial owners of far more than 10% of the outstanding shares of Navidea's common stock.

104.     By virtue of their beneficial ownership of more than 10% of the outstanding shares of Navidea's common stock, the Platinum Defendants were statutory insiders of Navidea subject to Section 16 of the Act at all relevant times.

### The Platinum Defendants' Status
### as Statutory Directors of Navidea

105.     Even if the Blocker had worked effectively to limit the Platinum Defendants' beneficial ownership of Navidea's common stock, they would have remained subject to Section 16 as statutory directors as long as Goldberg served on Navidea's board.

106.     Under the "deputization" doctrine, an entity becomes a "director" of an issuer for Section 16 purposes if an individual serves, expressly or by implication, as its deputy on the issuer's board.  *See, e.g.*, *Roth ex rel. Beacon Power Corp. v. Perseus, L.L.C.*, 552 F.3d 242, 246 (citing *Blau v. Lehman*, 368 U.S. 403, 409-10 (1962)).

107.     The Platinum Defendants were statutory directors under the deputization doctrine because Goldberg acted on their behalf while serving on Navidea's Board of Directors.

108.     In connection with his appointment to Navidea's board, Goldberg and Navidea entered into a Director Agreement dated as of November 13, 2013 (the "Director Agreement").  A true and correct copy of the Director Agreement, in the form in which Plaintiff's counsel printed it from the SEC's EDGAR system, is attached hereto as Exhibit G.

109.     The Director Agreement purported to create a "Chinese wall"-style information barrier between Goldberg and the Platinum Defendants.  For so long as he sat on Navidea's board, he agreed not to participate in voting or investment decisions related to the Platinum Defendants' holdings of Navidea securities.  He also agreed to comply with Navidea's insider trading policies.

110.     Goldberg also undertook to formally separate his investment management business, Montaur Capital, from the Platinum Defendants.  Although this undertaking was not memorialized in the Director Agreement, it is evident from other publicly available documents, including a press release Navidea issued in May 2014.

111.     These gestures were intended to give the appearance that Goldberg and the Platinum Defendants were acting independently in relation to Navidea.  But as with the Blocker, appearances were deceiving.  Despite the provisions of the Director Agreement and Goldberg's undertaking to separate Montaur Capital, he and the Platinum Defendants remained intimately affiliated while he sat on Navidea's board.

112.     Hints of this continuing affiliation can be found in the Director Agreement itself.  The preamble to the agreement gives Goldberg's address as "c/o Platinum."  The street address that follows is the same location in midtown Manhattan where the Platinum Defendants have their offices.

113.     The agreement directs that notices to Goldberg be sent "c/o Platinum" to the same address.  It also requires copies of any notice to be sent to Platinum's general counsel and outside lawyers.

114.    To this day, the official address that Goldberg keeps on file with the SEC is the location of the Platinum Defendants' offices in midtown Manhattan.

115.    Over time, Goldberg and the Platinum Defendants have neglected to maintain even the appearance of independence.

116.    For example, Goldberg held himself out as a representative of the Platinum Defendants in a newspaper article from May 2014. The article quoted him using the first person plural to refer to himself and the Platinum Defendants in describing a dilutive stock offering by Navidea:

> "I don't think the stock ever traded up after that deal was announced," he said. "*We at Platinum* were very, very . . . we were not favorably disposed."

Carrie Ghose, "Navidea Slowing Alzheimer's, Parkinson's Research Until Sales Catch Up, Jobs Impact Uncertain," Columbus Business First (May 16, 2014) (ellipsis in original, emphasis added), *available at* http://www.bizjournals.com/columbus/news/2014/05/16/navidea-slowing-alzheimer-s-parkinson-s-research.html (last visited Aug. 12, 2015).

117.    The reporter got the message. Although she quoted Goldberg as being "apoplectic" over the transaction, the subhead of her article attributed the apoplexy to the Platinum Defendants themselves: "Navidea's Biggest Investor Platinum-Montaur 'Apoplectic,' Amped Involvement After Crede Deal."

118.    A true and correct copy of that article, in the form in which Plaintiff's counsel printed it from its online publication, is attached hereto as <u>Exhibit H</u>.

119.    The perception that Goldberg acts on the Platinum Defendants'
behalf was recently confirmed again.  Just this past March Navidea announced that its
Macrophage subsidiary, which Goldberg heads, would receive a new $2.5 million
investment.  Navidea's press release described the deal as "led by Platinum-Montaur Life
Sciences and Dr. Goldberg."

120.    According to the press release, the investors in the deal received
new equity in Macrophage.  They were also given the right under certain circumstances
to exchange this equity for shares of Navidea's common stock.  As a result, Goldberg's
leadership at Macrophage gave the Platinum Defendants an opportunity to invest not only
in Macrophage but also in Navidea itself.

121.    Meanwhile, the plan to formally separate the investment activities
of the Platinum Defendants and Montaur Capital has stalled.  Although Goldberg
undertook to complete the separation back in November 2013, a Navidea report from
May 2014 described it as still "subject to the completion of final financial terms."

122.    Navidea's most recent annual report, filed with the SEC just this
past March, was even less committal.  It disclosed that "Dr. Goldberg has advised the
Company that he is in the process of completing his withdrawal from any ownership or
management position with Platinum, but he has not advised the Company of the specific
terms or timing of completing such separation."

123.    The long-contemplated separation has not stopped Montaur Capital
and the Platinum Defendants from working together on other business matters.  A review

of social media shows that they have hired some of the same employees, and they have also collaborated on investments outside Navidea.

124.    In 2014, Goldberg joined the Platinum Defendants and several of their affiliates in waging a proxy contest for seats on the board of Echo Therapeutics, Inc. ("Echo"), another biopharmaceutical company.  Their proposed director nominees were none other than Goldberg and his cousin, Shepard Goldberg.

125.    Echo resisted the nominations, warning its stockholders of "the potential for conflicts of interest . . . given Dr. Goldberg's historical business relationship with Platinum in his role as Portfolio Manager of Platinum-Montaur."

126.    Goldberg and his cousin were ultimately seated on Echo's board, but Echo's warning was prescient.  As Navidea's recent history shows, Goldberg views the Platinum Defendants as more than significant backers of Navidea's business.  He views them as *his* backers, and himself as one of them.

127.    For so long as Goldberg has served on Navidea's Board of Directors, he has served as the Platinum Defendants' de facto deputy.  He joined the board on November 13, 2013 and has served on it continuously since then.

128.    It follows that the Platinum Defendants have been statutory directors of Navidea for purposes of Section 16 at all times since November 13, 2013.

### The Platinum Defendants' Transactions in Navidea's Common Stock

129.    As alleged in paragraphs 55-128 above, each of the Platinum Defendants has been subject to Section 16 of the Act at all relevant times with respect to its transactions in Navidea's common stock and derivative securities.

130.    While subject to Section 16 of the Act, the Platinum Fund engaged in the following transactions in Navidea's common stock:

(a)    On or about August 20, 2013, the Platinum Fund sold 10,700 shares at a price of $2.9900 per share.

(b)    On or about August 21, 2013, the Platinum Fund sold 100,000 shares at a price of $3.0184 per share.

(c)    On or about August 21, 2013, the Platinum Fund sold 39,052 shares at a price $3.0637 per share.

(d)    On or about August 22, 2013, the Platinum Fund sold 2,100 shares at a price of $2.9900 per share.

(e)    On or about August 23, 2013, the Platinum Fund sold 53,310 shares at a price of $3.0147 per share.

(f)    On or about August 23, 2013, the Platinum Fund sold 3,400 shares at a price of $3.0406 per share.

(g)    On or about August 26, 2013, the Platinum Fund sold 50,891 shares at a price of $3.0483 per share.

(h)    On or about August 26, 2013, the Platinum Fund sold 19,679 shares at a price of $3.0575 per share.

(i)    On or about August 27, 2013, the Platinum Fund sold 10,709 shares at a price of $2.9931 per share.

(j)    On or about August 29, 2013, the Platinum Fund sold 12,600 shares at a price of $2.9924 per share.

(k)     On or about August 30, 2013, the Platinum Fund sold 1,700 shares at a price of $2.9906 per share.

(l)     On or about September 3, 2013, the Platinum Fund sold 1,100 shares at a price of $2.9909 per share.

(m)     On or about October 31, 2013, the Platinum Fund purchased 15,884 shares at a price of $1.9987 per share.

(n)     On or about November 1, 2013, the Platinum Fund purchased 536,552 shares at a price of $1.9890 per share.

(o)     On or about November 5, 2013, the Platinum Fund purchased 159,663 shares at a price of $1.9179 per share.

131.    The following table summarizes the Platinum Fund's transactions as alleged more fully in paragraph 130 above:

| Date of Transaction | Transaction | Number of Shares | Price per Share |
| --- | --- | --- | --- |
| 08/20/13 | Sale | 10,700 | 2.9900 |
| 08/21/13 | Sale | 100,000 | 3.0184 |
| 08/21/13 | Sale | 39,052 | 3.0637 |
| 08/22/13 | Sale | 2,100 | 2.9900 |
| 08/23/13 | Sale | 53,310 | 3.0147 |
| 08/23/13 | Sale | 3,400 | 3.0406 |
| 08/26/13 | Sale | 50,891 | 3.0483 |
| 08/26/13 | Sale | 19,679 | 3.0575 |
| 08/27/13 | Sale | 10,709 | 2.9931 |
| 08/29/13 | Sale | 12,600 | 2.9924 |
| 08/30/13 | Sale | 1,700 | 2.9906 |

| Date of Transaction | Transaction | Number of Shares | Price per Share |
|---------------------|-------------|------------------|-----------------|
| 09/03/13 | Sale | 1,100 | 2.9909 |
| 10/31/13 | Purchase | 15,884 | 1.9987 |
| 11/01/13 | Purchase | 536,552 | 1.9890 |
| 11/05/13 | Purchase | 159,663 | 1.9179 |

132.    The transactions described in paragraphs 130-131 above were never disclosed by the Platinum Defendants under Section 16(a) of the Act.

133.    Plaintiff knows of these transactions only because the Platinum Defendants disclosed them in an amended statement on Schedule 13D filed with the SEC on November 18, 2013 (the "November 2013 Schedule 13D").  A true and correct copy of the November 2013 Schedule 13D, in the form in which Plaintiff's counsel printed it from the SEC's EDGAR system, is attached hereto as Exhibit I.

134.    The November 2013 Schedule 13D gives only a limited account of the Platinum Defendants' transactions in Navidea's common stock.

135.    Under SEC regulations, a statement on Schedule 13D must disclose only those transactions "effected during the past sixty days or since the most recent filing of Schedule 13D, whichever is less."  17 C.F.R. § 240.13D-101 item 5(c) (citation omitted).  The Platinum Defendants accordingly limited the disclosure in the November 2013 Schedule 13D to "transactions in [Navidea's] Common Stock during the past 60 days."  November 2013 Schedule 13D item 5(c); see also id. sch. A ("Transactions in the Common Stock during the past 60 days").

136.    The limited disclosure requirements for Schedule 13D statements, coupled with the high trading volume disclosed on the November 2013 Schedule 13D,

invite the reasonable inference that the Platinum Defendants have engaged in additional undisclosed transactions.

137.    That inference is especially compelling because the Platinum Defendants have relied on the Blocker and the other contrivances discussed earlier to avoid Section 16 obligations, including the disclosure obligations of Section 16(a). Those efforts were wasted unless the Platinum Defendants actually had something to disclose.

138.    The filings made by the Platinum Defendants under other provisions of the Act show that they did.  They reveal that the Platinum Defendants engaged in substantial additional undisclosed transactions in Navidea's common stock and derivative securities over the past three years.

139.    During that time, the Platinum Defendants or their affiliates have filed with the SEC at least 20 statements or reports under Section 13 of the Act with respect to Navidea's securities.

140.    Although these statements and reports do not comprehensively list securities transactions, they give snapshots of securities holdings from which transactions may be inferred.

141.    In the case of the Platinum Defendants, these filings show a constantly shifting stake in Navidea's common stock, as the following examples illustrate:

(a)     A report on Form 13F filed with the SEC on November 14, 2014 disclosed holdings as of September 30, 2014 of 15,046,431 shares of Navidea's common stock.

(b)     A report on Form 13F filed with the SEC on February 17, 2015 disclosed holdings as of December 31, 2014 of 14,603,603 shares of Navidea's common stock and call options covering an additional 6,100,000 shares.

(c)     A report on Form 13F filed with the SEC on May 15, 2015 disclosed holdings as of March 31, 2015 of 11,454,831 shares of Navidea's common stock and call options covering an additional 6,100,000 shares.

142.    None of the Platinum Defendants' Section 16(a) reports in the past year disclosed any transactions that would account for their disposition of Navidea common stock between September 30, 2014 and March 31, 2015.

143.    Likewise, none of the Platinum Defendants' Section 16(a) reports in the past year disclosed any transactions that would account for their acquisition of call options on Navidea common stock between September 30, 2014 and December 31, 2014.

144.    These omissions, coupled with the other facts discussed above, make it likely that the Platinum Defendants have engaged in substantial undisclosed transactions in Navidea's common stock and derivative securities.

145.    The Platinum Defendants are liable to disgorge $328,465.94 in short-swing profit just from the transactions described in paragraphs 130-131 above.

146.    Once their undisclosed transactions are properly accounted for, the Platinum Defendants will likely owe Navidea hundreds of thousands, if not millions of dollars in additional short-swing profit.

**FIRST CLAIM FOR RELIEF
AGAINST EACH PLATINUM DEFENDANT**

147.    Plaintiff realleges and incorporates by reference the allegations in paragraphs 1-146 above.

148.    Each Platinum Defendant was subject to Section 16 of the Act (a) at all relevant times as the beneficial owner of more than 10% of the outstanding shares of Navidea's common stock; and (b) at all times on and after November 13, 2013 as a statutory director of Navidea.

149.    While subject to Section 16 of the Act, the Platinum Defendants engaged in purchases and sales of Navidea's common stock, including but not limited to those described in paragraphs 130-131 above.

150.    Certain of the sales described in paragraph 149 above occurred within less than six months of, and at higher prices than, certain of the purchases described in paragraph 149 above.

151.    Each Platinum Defendant had a direct or indirect pecuniary interest in the purchases and sales of Navidea's common stock described in paragraph 149 above.

152.    Under the "lowest-in, highest-out" method for computing realized profit pursuant to Section 16(b) of the Act, the Platinum Defendants realized recoverable profit as a result of the transactions described in paragraph 149 above in an amount to be

determined after discovery and trial, but in any case not less than $328,465.94 in the aggregate.

153.    Under Section 16(b) of the Act, the profit realized by the Platinum Defendants as described in paragraph 152 above inured to Navidea and is its lawful property, recoverable by Plaintiff in its stead, Navidea having failed or refused to seek recovery despite due and timely demand for the same.

## DEMAND FOR JURY TRIAL

Plaintiff respectfully demands a trial by jury on all issues so triable.

[*remainder of page intentionally left blank*]

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays this Court enter judgment:

(a)     Requiring each Platinum Defendant to account for and pay over to Navidea the short-swing profit it has realized and retained in violation of Section 16(b) of the Act in an aggregate amount not less than $328,465.94, together with appropriate pre- and post-judgment interest and the costs of this suit;

(b)     Awarding Plaintiff his costs and disbursements including reasonable attorney's, accountant's, and expert witness fees; and

(c)     Granting Plaintiff such further relief as the Court deems just and proper.

Dated: August 12, 2015
       New York, New York

HUNTER & KMIEC

By: _____

James A. Hunter
255 West 94th Street, No. 10M
New York, New York  10025
Tel:    (646) 666-0122
Fax:    (646) 462-3356
E-Mail: hunter@hunterkmiec.com

*Attorneys for Plaintiff*

-35-